**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THELMA WOLFE,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-1868** |
| **v.** | : | |
| | | **(JUDGE MANNION)** |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | | |
| **Social Security[1],** | : | |
| **Defendant** | : | |

**MEMORANDUM**

The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Social Security Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act ("Act"). 42 U.S.C. §§401-433. Upon review, the court will remand the instant action to the ALJ for further consideration of the plaintiff's subjective complaints of pain and residual functional capacity in accordance with this memorandum.

**I.    PROCEDURAL BACKGROUND**

The plaintiff protectively filed her application for benefits on March 23,

---

[1]On February 14, 2013, Carolyn Colvin became Acting Commissioner of the Social Security Administration. Pursuant to Fed.R.Civ.P. 25(d), she has been substituted as the defendant.

2010, in which she alleged an inability to engage in substantial gainful activity as of August 30, 2008, because of chronic neck and back pain, arthritis, headaches, Irritable Bowel Syndrome, ("IBS"), and depression. (TR. 95, 136).

After her claim was denied, (TR. 99-110), the plaintiff requested a hearing, which was held before an administrative law judge, ("ALJ"), on April 19, 2011. (TR. 34-61). The plaintiff was represented at her hearing before the ALJ by the same counsel representing her in this appeal. In addition to the plaintiff's testimony, the ALJ heard the testimony of Gerald W. Keating, a vocational expert. (TR. 54-59).

On May 19, 2011, the ALJ issued her decision in which she found that the plaintiff met the insured status requirements of the Act through December 31, 2012; the plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 30, 2008; the plaintiff has the following severe impairments: obesity, asthma, history of left hip sprain, degenerative disc disease of the cervical spine, and degenerative disc disease of the lumbar spine; the plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1; the plaintiff has the residual functional capacity, ("RFC"), to perform sedentary work as defined in 20 C.F.R. §404.1567(a), except her ability to work at that level is reduced in that: (1) she must be afforded the option to sit or stand at will, (2) she is limited to

occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing on ramps and stairs, (3) she must avoid occupations that require pushing and pulling with the lower left extremity to include the operation of pedals; (4) she is limited to occupations that require no more than occasional overhead reaching, pushing and pulling with the upper extremities to include the operation of hand levers and overhead work; (5) she must avoid concentrated, prolonged exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, cold temperature extremes, excessive noise, vibration, extreme dampness, and humidity, (6) she is limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights, and (7) she is limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes; the plaintiff was unable to perform any past relevant work; the plaintiff was born on January 12, 1965, and was 43 years old on the alleged disability onset date, which is defined as a younger individual age 18-44; the plaintiff has at least a high school education and is able to communicate in English; transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not

3

disabled," whether or not the plaintiff has transferable job skills; considering the plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform; and the plaintiff had not been under a disability, as defined in the Act from August 30, 2008, through the date of the ALJ's decision. (TR. 15-28).

The plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied. (TR. 1-6, 12-14).

Currently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security. (Doc. 1).


## II.    DISABILITY DETERMINATION PROCESS

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance. The Commissioner must sequentially determine: (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work. See 20 C.F.R. §404.1520.

The instant action was ultimately decided at the fifth step of the process, when the ALJ determined that, while the plaintiff could not perform her past

relevant work activity, her impairments did not prevent her from doing sedentary work activity with restrictions. (TR. 27-28).

## III.    EVIDENCE OF RECORD

The plaintiff was born on January 12, 1965, and was 43 years old at the time of her alleged onset date. (TR. 27). She has a high school education and completed two years of college education. (TR. 27, 243).  Her past relevant work experience includes positions as a train operator and conductor for the New York City Transit Authority. (TR. 243).

The medical evidence of record indicates that while working on August 30, 2008, the plaintiff slipped and fell on a wet surface, with her left leg going outward, and she twisted her lower back on the left side. (TR. 243). The plaintiff was taken to the emergency room where she was evaluated. (Id.). X-rays were negative and the plaintiff was released. (Id.).

On September 2, 2008, Dr. Marc Parnes, the plaintiff's family physician, examined the plaintiff and noted spasm and significantly limited bending and ambulation. (TR. 22, 507). Plaintiff had positive straight-leg raising[2] on the left at 60 degrees and positive on the right at 80 degrees. Dr. Parnes diagnosed

---

[2]The straight leg raise, also called Lasègue's sign, in lumbar disk disease, is pain that radiates into the leg after the hips and knees are flexed and the knee is extended. Taber's Cyclopedic Medical Dictionary at 1149 (19th ed.  2001).

lumbosacral derangement, with sprain, strain, spasm, and bilateral sciatic radiculopathy; and a left hip sprain. (Id.). The plaintiff was prescribed Celebrex and physical therapy, and was referred for neurological consultation. (TR. 507).

On September 22, 2008, the plaintiff treated with Dr. R.C. Krishna, a neurologist. (TR. 23, 264). The plaintiff's low back pain was rated at about 7-8 out of 10 when it was most intense. (Id.). The plaintiff complained of difficulty standing and sitting, and that Valsalva-type maneuvers, such as sneezing, straining, coughing, bending, and heavy lifting, tended to exacerbate her pain. (Id.). Plaintiff was noted to have 4/5 weakness in some of the muscles on the left side, positive straight-leg raising at 30 degrees on the left, and an antalgic gait. (TR. 23, 265). In addition, plaintiff was noted to have spasms in the cervical and lumbar spine and decreased range of motion. (TR. 265). The plaintiff's sensation was normal, except for decreased pinprick sensation on the outer aspects of the left leg. (TR. 266). The plaintiff was assessed with a cervical and lumbar strain injury and a neuropathic pain syndrome. She was given prescription medication. (Id.).

On October 1, 2008, the plaintiff saw Dr. John S. Mazella, a Board-certified orthopedic surgeon, who performed an independent orthopedic evaluation of the plaintiff at the request of the Workers' Compensation insurance carrier. (TR. 261). Upon examination, Dr. Mazella noted that the

6

plaintiff appeared mildly uncomfortable during the examination and that she had a slight antalgic gait pattern with weight bearing on the left. (Id.). The plaintiff was able to do single leg stands with left hip and low back pain, and was able to perform heel and toe rises with left-sided pain. (Id.). Dr. Mazella noted mild spasm on the left with myofascial irritation and decreased range of motion, and negative straight-leg raising bilaterally. (Id.). The plaintiff could not complete the Patrick's maneuver[3] on the left because of left hip pain and her left hip range of motion was restricted to fifty percent of normal. (Id.). Left hip flexion produced some groin pain. (Id.). Dr. Mazella diagnosed the plaintiff with left hip groin adductor strain and lumbar sprain/strain without radiculopathy. (TR. 262). He indicated that the plaintiff was able to work, but was restricted to lifting, carrying, pushing and pulling of ten to twenty pounds. (Id.). It was further recommended that the plaintiff avoid twisting, climbing, and bending movements; she was limited in walking; she could not work at heights, operate a motor vehicle and/or mechanical equipment at work, or perform repetitive movements of the spine. (Id.).

In November 2008, Dr. Krishna administered a facet join injection. (TR.

---

[3]Patrick's test is a test for arthritis of the hip. The thigh and knee of the supine patient are flexed, and the external malleolus of the ankle is placed over the patella of the opposite leg. The test result is positive if depression of the knee produces pain. Taber's Cyclopedic Medical Dictionary at 1528 (19th ed.  2001).

23, 267).

On February 19, 2009, the plaintiff underwent an MRI on the cervical spine which showed bulging discs at C3-4 and C6-7, mild left neural foraminal stenosis at C3-4, and no significant spinal canal stenosis at any level. (TR. 275).

On April 15, 2009, Dr. Mazella reviewed the plaintiff's February 2009 cervical spine MRI, as well as a February 2009 MRI of the plaintiff's lumbar spine, which showed a bulging disc at L5-S1, with no significant neural foraminal or spinal canal stenosis at any level. (TR. 254-55, 450). Upon examination, Mr. Mazella noted no spasms in the plaintiff's cervical or lumbar spine, but did note a decreased range of motion of the lumbar spine. (TR. 255). A Patrick's test was positive on the left for left low back pain and negative for left hip pain. (TR. 256). Straight leg raising was negative. (Id.). The plaintiff was diagnosed with cervical strain/sprain without radiculopathy and lumbar strain/sprain with myofascial irritation trigger points on the left side, without radiculopathy. (Id.). Dr. Mazella opined that the plaintiff could work, but was restricted to lifting no more than twenty-five pounds, and should avoid twisting, climbing, and bending. (TR. 256-57).

On May 4, 2009, the plaintiff reported to Dr. Krishna pain relief for some time from the facet joint injection administered on November 4, 2008. (TR. 23, 267). At that time, a second facet injection was administered, after which the

8

plaintiff again reported pain relief. (TR. 267).

On May 29, 2009, the plaintiff treated with Dr. Sebastian Lattuga, who performed a neurological examination and found that sensation was altered in the C6, L5-S1 nerve root distributions, along with positive straight leg raising test. Dr. Lattuga diagnosed the plaintiff with cervical bulges, radiculopathy, sprain, and lumbar bulges, radiculopathy, sprain. (TR. 186-88).

On June 24, 2009, and July 13, 2009, the plaintiff treated with Dr. Andrew M.G. Davy, who diagnosed the plaintiff with cervical and lumbar radiculopathy. (TR. 454-63).

In July 2009, the plaintiff was again seen by Dr. Mazella. At that time, Dr. Mazella noted that the plaintiff was able to walk into the room without a limp or cane. (TR. 244-45). Upon examination, no spasm was noted in the lumbar spine. The plaintiff had positive straight leg raising on the left side and negative on the right with mild left lower extremity weakness. (TR. 245). Dr. Mazella diagnosed cervical strain/sprain with left-sided C6-7 radiculopathy and lumbar strain/sprain with myofascial trigger point and left-sided sciatic radiculopathy. (Id.). The plaintiff was, again, found able to work, but was restricted to lifting no more than twenty-five pounds, and was advised to avoid twisting, climbing, and bending, operating a motor vehicle and/or mechanical equipment at work, performing repetitive spinal movements and working at heights. (Id.).

On August 17, 2009, Dr. Krishna noted that the plaintiff was doing better and released the plaintiff to return to work at full duty, with no restrictions. (TR. 24, 466).

In September 2009, the plaintiff underwent an EMG study which showed chronic L5-S1 radiculopathy. (TR. 270-73, 439).

On December 4, 2009, Dr. Krishna noted that the plaintiff was then able to perform less than a full range of sedentary work activity. Specifically, he opined that the plaintiff could not lift objects that weighed greater than five pounds; could only stand or walk for approximately one hour in an eight hour workday; could only sit for approximately half an hour in an eight hour workday; could never stoop, crouch, kneel, bend, climb, or balance; could only walk half a block before needing to stop; and could not travel alone by public transportation. Dr. Krishna further opined that the plaintiff could not work in any capacity and that her impairments had lasted or would last for at least another twelve months. (TR. 276-80, 415-19).

In February 2010, Dr. Krishna noted that the plaintiff had pain relief from the facet injections. (TR. 486). Upon examination, the plaintiff had tenderness on palpation and positive paravertebral trigger points along the lumbar spine with numbness in the legs and feet. (Id.).

In March 2010, Dr. Mazella observed that the plaintiff appeared mildly uncomfortable and walked in the room with an antalgic gait and a cane in the

left hand. (TR. 516). Plaintiff was unable to heel and toe walk, but was able to perform heel and toe rises in place with reported left-sided pain. (Id.). The plaintiff had no localized area of trigger points upon examination of the lumbar spine; however, mild spasm was present, and active range of motion was unchanged compared to passive. (Id.). The plaintiff was diagnosed with left L5 sciatic radiculopathy. It was recommended that she not lift and carry in excess of twenty pounds; avoid twisting, climbing and bending movements; was limited in walking; could not work at heights, and in operating a motor vehicle or mechanical equipment at work, and was limited in performing repetitive movements of the spine. (Id.).

On April 22, 2010, Dr. Krishna indicated that the plaintiff had been diagnosed with cervical and lumbar radiculopathy and was receiving physical therapy. (TR. 416). It was noted that the plaintiff did not have any side effects from her medications and that they did not limit her activities. (Id.). Dr. Krishna opined that the plaintiff was "unable to work in any functional capacity as a result of her diagnoses." (TR. 414-19).

In April 2010, Dr. Krishna administered another facet injection. (TR. 495).

On April 26, 2010, Dr. Krishna completed a note indicating that the plaintiff was totally disabled. (TR. 413).

On March 3, 2011, the plaintiff treated with Dr. Mehrdad Hedayatnia,

who diagnosed the plaintiff with lumbar radiculopathy. (TR. 509-10).

At her hearing before the ALJ, the plaintiff testified that she suffered from excruciating pain, muscle spasms and radiating symptoms in her back, which would occasionally cause her left leg to give out and make her fall. The plaintiff testified to using a cane at times. The plaintiff also testified to experiencing significant pain and discomfort in her neck, which worsened her migraine headaches.

With respect to functional capabilities, the plaintiff testified that she could carry objects only about the weight of her pocketbook, which was noted to be about ten pounds. She testified that she could go shopping occasionally for short periods of time with her husband or daughter, but testified to spending most of her time at home.

The plaintiff testified that she took medication for her conditions which would make her sleepy. Although the plaintiff attempted physical therapy, she testified that it caused her increased pain and so she stopped going.

Also testifying at the plaintiff's hearing was Gerald W. Keating, a vocational expert. Mr. Keating was posed three hypothetical questions by the ALJ. (TR. 58-61). Initially, Mr. Keating was asked to consider an individual whose RFC permitted sedentary work, limited by the ability to be able to sit and stand at will, limited to occupations that require only occasional balancing, stooping, crawling, kneeling, crouching, climbing on ramps or

12

stairs, no exposure to climbing ladders, ropes and scaffolds, no pushing and pulling of the lower left extremity, avoid concentrated and prolonged exposure to fumes, odors, dust, gases, chemical irritants, environments with poor ventilation, cold temperature extremes, excessive noise, vibration, extreme dampness and humidity, limited to occupations which avoid dangerous machinery, heights, and requiring no more than simple, routine tasks not performed in a fast paced production environment, involving only simple work related decisions and, in general, relatively few workplace changes. Mr. Keating testified that, as representative samples, the individual could perform the positions of assembler of small products, telephone receptionist, or telephone solicitor, non-sales.

The ALJ then asked Mr. Keating to consider that the individual had additional considerations of restrictions of no more than occasional overhead reaching, pushing, or pulling with the upper extremities to include the operation of hand levers and overhead work. Mr. Keating's opinion did not change.

Finally, the ALJ asked Mr. Keating to include that the individual would be off task for more than thirty percent of the workday due to chronic back and lower extremity pain, plus migraine headaches and neck pain. With these additional restrictions, Mr. Keating testified that the individual could not do any jobs of a competitive nature.

13

## IV.   DISCUSSION

In support of her appeal, the plaintiff initially argues that the ALJ erred when assessing her RFC. (Doc. 11, pp. 4-7). Specifically, the plaintiff argues that Dr. Krishna assessed her RFC and opined that she could not work in any capacity and that her impairments have lasted and will last for at least another twelve months. Despite this, the plaintiff argues that the ALJ found that she retained the ability to perform sedentary work. In so finding, the plaintiff argues that the ALJ erred in her determination that the plaintiff did not have chronic neurological deficits as a result of her cervical and lumbar impairments. To the contrary, the plaintiff argues that the medical records clearly demonstrate that Dr. Krishna diagnosed her with neuropathic pain syndrome and that on numerous occasions spanning from September 22, 2008, through September 24, 2010, Dr. Krishna found positive signs of neurological deficits upon examination of the plaintiff, including positive findings of decreased sensation on the outer aspect of the left leg to pinprick, reduced deep tendon reflexes of 1+ for the left ankle jerk, positive straight leg raising on the left, radiating pain, associated with numbness and tingling from the neck to the upper extremities and from the back to the lower extremities. The plaintiff argues that the ALJ failed to consider any of these findings in determining her RFC.

The plaintiff argues that Dr. Krishna's findings are consistent with the

14

findings of other physicians, such as Dr. Parnes, who found that she had bilateral sciatic radiculopathy and Dr. Lattuga, who found that her sensation was altered in the C6, L5-S1 nerve root distributions, along with a positive straight leg test. As a result of his examination, Dr. Lattuga diagnosed the plaintiff with cervical bulges, radiculopathy, sprain, and lumbar bulges, radiculopathy, and sprain. Further, Dr. Davy diagnosed the plaintiff with cervical and lumbar radiculopathy, and Dr. Hedayatnia diagnosed the plaintiff with lumbar radiculopathy. The plaintiff argues that, even the Workers' Compensation physician, Dr. Mazella, noted neurologic impairments to the extent that he found positive straight leg raise on the left, left lower extremity weakness, C6-7 dermatomal hypesthesia, L5 dermatome hypesthesia of the left calf muscle, and C6-7 radiculopathy. Dr. Mazella diagnosed the plaintiff with left L5 sciatic radiculopathy.

The plaintiff argues that the above findings were confirmed by the September 2009 EMG of the lumbar spine which revealed evidence of chronic left L5-S1 radiculopathy and a February 2009 MRI which revealed bulging discs at C3-4 and C6-7, and mild left neural foraminal stenosis. The plaintiff argues that the ALJ further failed to discuss these objective tests.

In considering the plaintiff's initial argument, residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social

Security Ruling 96–8p, 61 Fed.Reg. 34475. A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

The Court of Appeals for the Third Circuit stated: "In making a residual functional capacity determination, the ALJ must consider all evidence before him . . . Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence . . . In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett v. Commissioner of Social Security, 220 F.3d 112, 121 (3d Cir. 2000) (internal citations and quotations omitted).

Residual functional capacity refers to what a plaintiff can do despite her limitations. 20 C.F.R. §404.1545(a). In determining the plaintiff's RFC, the ALJ must consider all relevant evidence, including the medical evidence of record and the plaintiff's subjective complaints. 20 C.F.R. §404.1545(a). At the hearing level, the responsibility for determining a plaintiff's residual functional capacity is reserved for the ALJ. 20 C.F.R. §404.1546. The final responsibility

for determining the RFC is reserved for the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §404.1527(e)(2), (3).

Here, it does not appear that the ALJ's finding with respect to a lack of chronic neurological deficit relates to the plaintiff's lower extremities, as argued by the plaintiff. After discussing extensively the objective testing and clinical findings in the record relating to both the plaintiff's cervical and lumbar spine, the ALJ goes on to state that "[the plaintiff] does not have chronic neurological deficits and she had no loss of motor function in her upper extremities." (TR. 26) (emphasis added). She makes no such specific finding with regard to the plaintiff's lower extremities.

Moreover, upon review of the ALJ's decision, she specifically considered those neurological findings which the plaintiff argues she did not. The plaintiff argues that the ALJ failed to consider Dr. Krishna's diagnosis of peripheral neuropathy and the resulting symptoms of decreased sensation on the outer aspect of the left leg, reduced deep tendon reflexes for the left ankle jerk, positive straight let raise tests on the left, and radiating pain associated with numbness and tingling. However, these findings were discussed by the ALJ at page 23 of her opinion. In addition, although the plaintiff argues that the ALJ failed to review the EMG of September 21, 2009, and the MRI of February 19, 2009, these were discussed by the ALJ at page 24 and pages

17

22 and 26, respectively.

Citing to Johnson v. Commissioner of Social Security, 529 F.3d 198, 203 (3d Cir. 2008), the plaintiff argues that, in considering the evidence of record, the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting such evidence. The plaintiff argues that the ALJ failed to consider Dr. Krishna's neurological findings and the diagnostic studies in determining her RFC and, in doing so, refused to accept Dr. Krishna's RFC. The plaintiff argues that the ALJ's failure to consider this portion of the medical record adversely impacted her RFC determination.

As discussed, the ALJ did consider Dr. Krishna's neurological findings and the diagnostic studies in determining the plaintiff's RFC. Further, in determining the plaintiff's RFC, the ALJ weighed the medical opinions of evidence indicating that she gave little weight to Dr. Krishna's opinions that the plaintiff was unable to engage in any work activity because they were not supported by the imaging of her cervical and lumbar spine. The ALJ also gave little weight to Dr. Krishna's functional capacity evaluation from March 2010 and his medical source statement dated April 2010 because they too were not supported by the imaging results and the objective medical findings[4]. The ALJ

[4]The court notes that Dr. Krishna's functional evaluations were also (continued...)

18

only gave some weight to the opinions of Dr. Mazella which indicated that the plaintiff could engage in light work activity, instead finding that the plaintiff was more limited to sedentary work activity. Here again, the ALJ explained that she gave greater weight to the objective physical findings. Finally, the ALJ gave no weight to the state agency physician's opinion regarding the plaintiff's residual functional capacity because it was not offered by a medical source.

In considering the above, under the regulations, the ALJ is obligated to choose between medical source testimony or conclusions that are conflicting. See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Here, the record establishes that the ALJ properly considered and weighed the medical opinions of record[5].

Next, the plaintiff argues that the ALJ did not apply the treating

---

[4](...continued)
internally inconsistent with him first determining that the plaintiff was unable to work in any capacity due to total disability through at least June 2009, (TR. 432, 437, 445, 448, 453), then indicating that she could return to work without any limitation in August 2009, (TR. 24, 466), and finally indicating shortly thereafter, in December 2009, that the plaintiff was again totally disabled, (TR. 276-80, 415-19).

[5]This being said, the plaintiff's fourth and final argument is that the ALJ erred in considering her subjective complaints of pain. As discussed later, the court agrees on this point. Because consideration of a claimant's subjective complaints of pain is part of the residual functional capacity evaluation, upon remand, the ALJ will need to reassess both the plaintiff's subjective complaints of pain and how that reassessment impacts her residual functional capacity determination.

physician rule correctly. (Doc. 11, pp. 7-9). Here, the plaintiff argues that the ALJ did not give her treating physician's opinion controlling weight and, instead, relied on the opinions of Dr. Mazella, the Workers' Compensation physician. The plaintiff argues that the ALJ failed to properly discuss the factors considered in not relying upon her treating physician's opinion.

The "treating physician rule," codified at 20 C.F.R. §404.1527(d)(2), addresses the weight to be given a treating physician's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. §404.1527(d)(2). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales, 225 F.3d at 317 (citing Plummer v. Apfel, 186 F.3d 422,

429 (3d Cir. 1999); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988)).

When the record contains contradictory medical evidence, the ALJ may choose whom to credit, but must explain the reasoning behind his/her conclusions. Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

Here, after setting forth the clinical findings of both Dr. Krishna and Dr. Mazella, the ALJ indicated that she would afford the opinions of Dr. Krishna little weight and the opinions of Dr. Mazella some weight. She stated that her decision was based upon the fact that Dr. Krishna's opinions were not consistent with the objective medical evidence of record, including the MRI of the plaintiff's cervical spine in February 2009 which showed bulging discs at C3-4 and C6-7 and mild neural foraminal stenosis at C3-4, but no significant spinal canal stenosis at any level; the MRI of the plaintiff's lumbar spine in February 2009 which showed a bulging disc at L5-S1 with no significant neural foraminal or spinal canal stenosis at any level; and an EMG in September 2009 which showed chronic L5-S1 radiculopathy[6]. Dr. Mazella had reviewed these same objective findings and conducted numerous consultative examinations of the plaintiff and concluded that, while the plaintiff's impairments did impose limitations upon her, she was still capable of

---

[6]While the plaintiff again argues that the ALJ did not consider these objective medical findings, as previously discussed, it is clear that the ALJ did consider these findings in relation to the other medical evidence of record.

engaging in some work activity. Where, as here, there are conflicting medical opinions, the ALJ is entitled to consider the objective medical evidence of record and weigh the credibility of the evidence. The ALJ did so in this case and, within her discretion, determined that Dr. Mazella's findings were more consistent with the objective medical evidence of record, although, as indicated above, she found the plaintiff more restricted in her functional capacity than did Dr. Mazella. As such, the ALJ did not violate the treating physician rule and the plaintiff's appeal will be denied on this basis as well.

Third, the plaintiff argues that the ALJ erred in crediting the opinion of the vocational expert. (Doc. 11, pp. 9-13). Specifically, the plaintiff argues that the ALJ posed three hypotheticals to the vocational expert. In response to the first two, the vocational expert testified that there would be jobs which the plaintiff could perform: assembler of small products, telephone receptionist, and a telephone solicitor. The plaintiff argues however that the jobs presented by the vocational expert were inconsistent with the limitations presented in the ALJ's hypotheticals and the Dictionary of Occupational Titles, ("DOT").

In considering this argument, an ALJ is required to inquire of the vocational expert as to whether his testimony is consistent with the DOT, and if not, to elicit testimony to explain the conflict. Nahory v. Colvin, 2013 WL 3943512 at *3 (W.D.Pa. Jul. 30, 2013) (citing S.S.R. 00–4p; Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir. 2002)). Minor inconsistencies between

the vocational expert's testimony and the DOT are not fatal. Rutherford v. Barnhart, 399 F.3d 546, 558 (3d Cir. 2005).

Here, the ALJ inquired and the vocational expert testified that his testimony was consistent with the DOT unless he stated otherwise. (TR. 56-57). Upon review, the DOT rates the position of assembler of small products as light duty, not sedentary, as posed in the ALJ's hypothetical. Moreover, the hypothetical provided that the individual would need to sit and stand at will and that she could not engage in tasks performed in a fast paced production environment. The assembler position, by its very definition, involves mass production, indicating a fast paced environment and, further, would require the individual to frequently work at a bench as a member of an assembly group and pass units to another worker. The hypothetical also included the restriction that the individual could not be around dangerous machinery; however, the assembler position requires the ability to load and unload previously setup machines such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches. Finally, the hypothetical provided that the individual should be exposed to relatively few workplace changes, whereas the assembler position indicates that the worker may be assigned to different work stations as production needs require or shift from one station to another to reduce fatigue factor. Despite the vocational expert's indication that his testimony was not inconsistent with

the DOT, none of these variances were discussed.

However, that being said, the vocational expert also testified that the plaintiff could perform the position of telephone receptionist. The plaintiff's only challenge to the receptionist position is that the DOT definition does not specifically provide for her positional sit/stand limitation. Upon review, the DOT receptionist description does not provide any requirement that the individual must sit and/or stand, and presumably, the individual could do either as he/she deemed necessary.

Further, the vocational expert testified that the individual would be able to work as a telephone solicitor, non-sales. As to the solicitor position, the plaintiff argues that this position also does not cover the positional limitation imposed by the ALJ and, in addition, would expose the plaintiff to excessive noise in a call center setting and would require more than 'simple work related decisions,' as such a job necessitates attempt to persuade potential customers. As to this argument, the plaintiff apparently views the solicitor position as sales only; however, the vocational expert testified that there is a non-sales component for the position of telephone solicitor which would simply be gathering information for a company and possibly passing it along to a sales department. There is no indication in the record that the non-sales solicitor position would not allow for a sit/stand option as posed by the ALJ; that it would require the plaintiff to be in a call center setting; or that the

position would involve persuading potential customers.

As discussed above, minor inconsistencies between the vocational expert's testimony and the DOT are not fatal. Rutherford v. Barnhart, 399 F.3d 546, 558 (3d Cir. 2005). Where a vocational expert notes that the occupations listed are just examples of what a hypothetical person with plaintiff's limitations could do, and where inconsistencies do not exist as to all the occupations listed by a vocational expert, remand is not required. Id. at 557.

Here, there are some significant inconsistencies which exist with one of the examples testified to by the vocational expert, i.e., the small assembler position. However, the vocational expert testified that the positions identified were only representative samples of occupations which the plaintiff could perform and there is no indication in the record of inconsistencies with the telephone receptionist or the non-sales telephone solicitor positions. As such, the court finds that remand is not required as to this issue.

Also as to the vocational expert's testimony, the plaintiff argues that the ALJ erred in not accepting the vocational expert's response to her third hypothetical, which included a provision that the plaintiff would be "off task" more than thirty percent of the work day because of chronic back and lower extremity pain, plus migraine headaches and neck pain, to which the vocational expert testified would yield no jobs.

As to this argument, as set forth by the ALJ, the evidence of record

simply dies not support a finding that the plaintiff would be off task more than thirty percent of the day due to chronic back and lower extremity pain or migraine headaches. Contrary to the plaintiff's testimony, the ALJ found that there was no evidence in the record that she presented to the emergency room for complaints of migraine headaches or that she received injections at the emergency room for her migraines. The record reflects that the plaintiff was prescribed medication for migraines, but there is no indication that her migraines were not controlled with the medication or that the medication was ineffective. To the extent that the additional limitations are not medically supported, the ALJ did not err in rejecting a response to a hypothetical incorporating additional limitations that are not supported by the medical evidence. See Jones v. Barnhart, 364 F.3d 501, 506 (3d Cir. 2004) (ALJ had authority to disregard a vocational expert's response to a hypothetical inconsistent with evidence).

Finally, the plaintiff argues that the ALJ improperly discredited her testimony and subjective complaints. Specifically, the plaintiff argues that the ALJ determined that the plaintiff's complaints were credible, but not to the extent alleged. In so concluding, the ALJ indicated that, if the plaintiff were experiencing pain over an extended period of time, she would expect that there might be "significant loss of weight, an altered gain or limitation of motion, local morbid changes, or poor coloring or station." The plaintiff argues

26

that, although the ALJ found that these conditions did not exist, the record contains no less than six separate indications of altered gait and at least seven indications of limited range of motion.

Here, the court finds that the ALJ improperly relied on her own lay opinion in rejecting the plaintiff's subjective complaints of pain. This exact issue was just recently addressed by the court in Witkowski v. Colvin, —F.Supp.2d—, 2014 WL 580204, **9-10 (M.D. Pa. Feb. 12, 2014):

> "[A]n ALJ may not make speculative conclusions without any supporting evidence." Burnett v. Commissioner, 220 F.3d 112, 125 (3d Cir. 2000). "[A]n ALJ may not make speculative inferences from medical reports," Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). An ALJ "may not employ her own expertise against that of a physician who presents competent medical evidence." Id. Nor may an ALJ rely on her own lay analysis of the medical records. Cruz v. Colvin, No. 12-CV-0135, 2013 WL 5299166, at *21 (M.D.Pa. Sept. 17, 2013) (Caldwell, J.) (citing in part Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir.1990)).

> Plaintiff argues that the ALJ improperly relied on her own lay opinion in rejecting Plaintiff's subjective complaints of pain. His objection is based on the following language from the decision:

>> In this case, the claimant's case in establishing disability is directly dependent on the element of pain which is of an intractable nature. Pain is subjective and difficult to evaluate, both quantitatively or qualitatively. Nevertheless, most organic diseases produce manifestations other than pain and it is possible to evaluate the underlying processes and degree of resultant impairment by considering all of the symptoms. Generally, when an

27

individual has suffered pain over an extended period, there will be observable signs such as a significant loss of weight, an altered gait or limitation of motion, local morbid changes, or poor coloring or station. In the present case, the claimant has complained of pain over an extended period of time. None of the above signs of chronic pain are evident. While not conclusory by itself, this factor contributes to the determination that the claimant is not disabled as a result of pain[7].

(Tr. 20).

This language has appeared from time to time in prior cases. In some cases, and apparently in the absence of an objection that it was improper lay opinion, the court has simply looked to whether the factual assertions about the absence of the described symptoms are supported by the record. If there is no support in the record, the conclusion is rejected as not being supported by substantial evidence. See Kostelnick v. Astrue, No. 12-CV-901, 2013 WL 6448859, at *7 (M.D.Pa. Dec. 9, 2013); Kinney v. Astrue, No. 11-CV-1848, 2013 WL 877164, at *2-3 (M.D.Pa. Mar. 8, 2013) ("The medical records . . . reveal where examining physicians noted an altered gait, local morbid changes (muscle atrophy), loss of weight and limitation of range of motion. The administrative law judge's finding that the medical records contain no evidence of a significant weight loss, an altered gait, limitation of motion, or local morbid changes is clearly erroneous."); Ennis v. Astrue, No. 11-CV-1788, 2013 WL 74375, at *8 (M.D.Pa. Jan. 4, 2013) ("Our review of the record reveals that on several occasions Ennis had medical or physical therapy appointments where she exhibited an altered gait and limitation of motion . . . The record also reveals that Ennis had atrophy of the foot muscles . . . The administrative law judge's assertion that Ennis did not exhibit an altered gait, limitation of motion or local morbid changes was clearly erroneous."); Hughes v. Astrue, No.

---

[7]The court notes that this is the exact language utilized by the ALJ in the instant action.

10-CV-2574, 2012 WL 833039, at \*12-13 (M.D.Pa. Mar. 12, 2012); Daniels v. Astrue, No. 08-CV-1676, 2009 WL 1011587, at \*17 (M.D.Pa. April 15, 2009).

On the other hand, other courts have decided that this language is improper lay opinion. See Ferari v. Astrue, No. 07-CV-1287, 2008 WL 2682507, at \*7 (M.D.Pa. July 1, 2008) (adopting the report and recommendation of the magistrate judge); Morseman v. Astrue, 571 F.Supp.2d 390, 396-97 (W.D.N.Y. 2008).

We agree with the latter two cases. As this language reveals, it is based upon the ALJ's own understanding that "most organic diseases" produce symptoms "other than pain" that can be used "to evaluate" Plaintiff's "degree of resultant impairment." It is also based on the ALJ's understanding that, generally, when an individual has suffered pain over an extended period, there will be observable signs such as a significant loss of weight, an altered gait or limitation of motion, local morbid changes, or poor coloring or station. However, this case deals specifically with lower back pain and leg pain arising from degenerative disc disease. Since the ALJ relied in this case on her general understanding of the symptoms that should appear when a person has complained about longstanding pain, regardless of the illness at issue, she improperly injected her lay opinion into the disability analysis. She should have instead relied on the medical evidence in the record.

As in Witkowski, the court finds that the ALJ in this case improperly injected her own lay opinion as to what signs and symptoms the plaintiff should have experienced in relation to her complaints of pain. The ALJ should have instead relied upon the medical evidence of record which, despite the ALJ's finding, contains repeated references of antalgic gait and limited range of motion. The instant action will therefore be remanded for reconsideration of the plaintiff's testimony and subjective complaints. Moreover, as noted

above, because this determination impacts the ALJ's RFC determination, that determination should also be reassessed on remand.

## V.    CONCLUSION

On the basis of the foregoing, an appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated:**  April 29, 2014

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-1868-01-hhs.wpd